**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TERRY PAGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | NO.  06-cv-4695 |
| | ) | |
| BANCROFT NEUROHEALTH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

_____

**MEMORANDUM OPINION AND ORDER**

RUFE, J.                                                                                      **August 29, 2008**

This is an action brought under the Employee Retirement Income Security Act of 1974

("ERISA"),[1] for payment allegedly owed by former employer Defendant to former employee Plaintiff

under a severance policy and a separate deferred compensation plan.  Presently before the Court are the

parties' cross-motions for summary judgment, as well as their respective responses and replies.  For the

reasons that follow, the Court will grant Defendant's Motion for Partial Summary Judgment and Deny

Plaintiff's Cross-Motion for Summary Judgment.

**I.      FACTUAL BACKGROUND**

Defendant, Bancroft Neurohealth, Inc. ("Bancroft" or "Defendant") is a non-profit

organization that runs a school as well as residential programs for the developmentally disabled.[2]  Plaintiff,

Dr. Terry Page, Ph.D. ("Page" or "Plaintiff"), is a board certified behavioral analyst who was hired by

Bancroft on September 20, 1991 as Chief of Behavioral Services.[3]  Plaintiff was promoted to the following

---

[1] 29 U.S.C. § 1001, et seq.

[2] Def.'s Resp. to Pl.'s Mot. for Summ. J. at 2.

[3] Pl.'s Mot. for Summ. J. at 1-2.

positions in the following years: Vice President of Rehabilitation and Brain Injury Services in 1994; Vice President of Program Operations in 1996; and Executive Vice President of Clinical Affairs in 2000, the position he held at the time of his termination in 2005.[4]  Plaintiff was terminated on September 7, 2005.[5] In its internal records, Bancroft cites the reason for Plaintiff's termination as "Unsatisfactory Job Performance."[6]  Plaintiff alleges, however, that he was terminated as a result of a reduction-in-force ("RIF") or layoff, not for poor job performance.

In January 1995, Bancroft implemented a Key Executive Severance Pay Policy ("1995 Severance Policy") as well as an Incentive Compensation Plan for Key Executives ("Deferred Compensation Plan").[7]  The Key Executive Compensation/Benefit Plan Summary ("Plan Summary") explains that the 1995 Severance Policy and the Deferred Compensation plan were offered for the purpose of "retaining" and "motivating" key executives.[8]

Plaintiff argues that the Court should enforce the 1995 Severance Policy and Defendant argues that we should enforce the July 2005 Severance Policy, to determine Plaintiff's eligibility for severance benefits.

A.    The 1995 Severance Policy

Bancroft alleges that the 1995 Severance Policy did not guarantee two years' salary to a senior executive with ten years of service terminated due to a RIF or layoff as Plaintiff proffers, rather, it

---

[4] Id. at 2.

[5] Def.'s Resp. at 2.

[6] Pl.'s Mot. at 6.

[7] Id. at 2.

[8] Id. at 3.

provided severance, in an amount not to exceed the maximum benefit of two years' salary in the event an eligible executive was "released."[9]  Bancroft further asserts that the 1995 Severance Policy set a maximum severance payment keyed to an employee's years of service, not a definite or guaranteed amount as alleged by Plaintiff.  Plaintiff completed his tenth year of employment with Bancroft on September 20, 2001.[10]  At the time of his termination, Plaintiff's base annual salary was $180,000.[11]  If benefits were paid to Plaintiff under the 1995 Severance Policy, Plaintiff alleges he would be entitled to receive $360,000 in the form of either regular paychecks or in a lump sum, beginning in September of 2005.[12]

Bancroft asserts that the 1995 Severance Policy reserved ultimate authority whether to grant any severance in its Chief Executive Officer or his designee, with the approval of the Personnel and Management Committee ("P&M Committee") of the Board of Trustees ("Board").  Plaintiff alleges that he understood his right to receive severance under the 1995 Severance Plan to be vested and guaranteed once he completed ten years of employment at Bancroft.[13]

**B.    The June 2005 and July 2005 Severance Plans**

Taking the position that Plaintiff is bound by the July 2005 Severance Policy instead of the 1995 Policy, Bancroft alleges that Plaintiff was fired for performance related reasons, so he is not entitled to severance pay under the existing policies.[14]  Bancroft alleges that it encountered severe financial

---

[9] Def.'s Resp. at 3.  The 1995 Severance Policy defines "Release" as "a failure to perform the job assignment in an appropriate and competent manner, as defined by performance criteria."  Pl.'s Mot. Ex. 4 at 1.

[10] Pl.'s Mot. at 5.

[11] Id. at 7.

[12] Id.

[13] Id.

[14] Id.

problems in 2004, and as a result, its Board amended the 1995 Severance Policy to halve the maximum benefits from two years' salary to one year's salary.[15]  Plaintiff alleges that these 2004 changes were not officially adopted and disseminated until June 2005 ("June 2005 Severance Policy").[16]  The June 2005 Severance Policy eliminated the key executives' car allowances.[17]  This amendment was documented in Bancroft's Board minutes, which was noticed to Plaintiff upon his receipt of a copy of the minutes from the relevant board meeting, even though he was not in attendance.[18]  Plaintiff alleges that the only material change to the severance policy referenced in the Board Minutes coinciding with the 2004 amendments, which were disseminated in policy form in June 2005, was the reduction of the severance benefit from two years' salary to one year's salary.[19]  Plaintiff maintains that the June 2005 Severance Policy incorporated a number of additional modifications to the 1995 Severance Policy that were not mentioned as having been approved by the Board in the minutes he received from the relevant meeting, including redefining the type of termination that would render an employee ineligible for benefits, and adding the requirement that beneficiaries sign a written release of claims.[20]

Bancroft alleges that its financial difficulties continued into 2005, and the June 2005 Policy was amended again in July 2005, and approved by the Board as the "[July] 2005 Severance Policy" at that time.[21]  Plaintiff again received copies of the Board minutes from this July 2005 meeting where these

---

[15] Id.

[16] Pl.'s Resp. at 6.

[17] Def.'s Resp. at 3.

[18] Id.

[19] Id.

[20] Id. at 7.

[21] Id.

-4-

amendments were adopted to create the July 2005 Severance Policy.[22]  The July 2005 Severance Policy differs from the 1995 Severance Policy in the following ways: (1) it reduces the severance benefit to an employee with greater than ten years of service from 24 months' to 9 months' salary;[23] (2) it allows severance benefits only in the event that an eligible executive was terminated as a result of a RIF or layoff;[24] and (3) it requires the signing of a separation agreement and release as a prerequisite for severance benefits.[25]  Bancroft alleges that the 2005 Severance Policy continued to reserve authority to grant severance to the CEO or his designee with the approval of the P&M Committee.[26]

Plaintiff alleges that following the July 2005 amendments, the administrative assistant to Bancroft's Chief Executive Officer erroneously disseminated the June 2005 Severance Policy to employees instead of the July 2005 Severance Policy.[27]  Plaintiff further alleges that there is no record of Plaintiff ever having signed a written acknowledgment of receipt of the July 2005 Severance Policy, and that he signed for receipt of the June 2005 policy instead.[28]  Plaintiff alleges that the one change effected by the July 2005 Severance Policy was the reduction of severance benefits for employees with ten years or more of service from one year's salary to 9 months' salary.  Plaintiff alleges that as a key executive of Bancroft, he was made aware of the modifications to the original 1995 Severance Policy.[29]  Plaintiff alleges that these

---

[22] Id.

[23] Pl.'s Mot. at 5.

[24] Def.'s Mot. at 3.

[25] Def.'s Resp. at 3.

[26] Id. at 4.

[27] Pl.'s Resp. at 6.

[28] Id.

[29] Id.

changes were seen as unilateral and unfair by himself and other members of the executive staff.[30]  Lastly, Plaintiff alleges that Bancroft never provided him with a separation agreement upon his termination, which he was required to submit as a prerequisite for severance eligibility under the July 2005 Severance Policy.

      **C.**    **Deferred Compensation Plan**

         Plaintiff alleges that at various times throughout his employment with Bancroft, he elected to defer compensation pursuant to the 1995 Deferred Compensation Plan.[31]  Bancroft alleges that Plaintiff was eligible to, and did, participate in its Deferred Compensation Plan, and that he agreed to be bound by the terms thereof by signing a written acknowledgment at the end of the Plan document.[32]  Bancroft alleges that each year a committee determined whether a bonus should be set aside as deferred compensation based on a Participant's performance during the preceding year.[33]  Bancroft further asserts that distribution of deferred compensation was subject to a five-year "Deferral Cycle."[34]  When a participant in the Deferred Compensation Plan left Bancroft, monies contributed to a deferral cycle that had not been completed were not distributed to the participant, but were forfeited instead.[35]  The Deferred Compensation Plan defines a "Separation of Service" as "a severance of the employer-employee relationship, other than a severance on account of Total and Permanent Disability or death."[36]  Bancroft alleges that Plaintiff's termination on

---

[30] Pl.'s Resp. at 7.

[31] Pl.'s Mot. at 7.

[32] Def.'s Resp. at 4.

[33] Id.

[34] Id.  Plaintiff, on the other hand, alleges the deferral cycle was a four-year cycle.  Pl.'s Mot. at 7.

[35] Id.

[36] Id.

September 7, 2005 constituted a separation from service, as defined by the Deferred Compensation Plan.[37]

## II.       PROCEDURAL HISTORY

Plaintiff initiated this action in the Court of Common Pleas of Philadelphia County on or about September 14, 2006, asserting a breach of contract claim arising from the 1995 Severance Agreement and another breach of contract claim arising from the Deferred Compensation Plan.[38]  Defendant removed the matter to this Court on or about October 18, 2006 on the basis of diversity jurisdiction as Plaintiff is a citizen of the Commonwealth of Pennsylvania, Defendant is a corporation organized under the laws of New Jersey, and the amount in controversy exceeds $75,000.[39]  Plaintiff filed an Amended Complaint on April 23, 2007, including an additional breach of contract claim, seeking enforcement of the June 2005 draft of the severance policy, in the alternative to Count I, which argues for enforcement of the 1995 Severance Policy.[40]  In July of 2007, Plaintiff filed his Second Amended Complaint, which includes: an ERISA claim for denial of benefits owed under the 1995 Severance Policy (Count I); in the alternative, an ERISA claim for denial of benefits owed under the June 2005 Severance Policy (Count II); and a third ERISA denial of benefits claim arising from the Deferred Compensation Plan (Count III).[41]  The parties filed cross-motions for Summary Judgment on October 1, 2007.  Plaintiff moves for summary judgment on all counts of the Second Amended Complaint, while Defendant moves for partial summary judgment on Counts I and II.  The parties timely filed their respective responses and replies, so the issues before the

---

[37] Id.

[38] Compl. ¶¶ 17-25.

[39] Notice of Removal [Doc. No. 1].

[40] Amen. Compl. ¶¶ 24-28.

[41] Second Amen. Compl. ¶¶ 20-40.

Court on summary judgment are fully briefed and ready for disposition.

## III.    LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[42]   A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party."[43]   "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[44]   All inferences must be drawn, and all doubts resolved, in favor of the nonmoving party.[45]

If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to do more than simply show that there is some metaphysical doubt as to the material facts.[46]   The nonmoving party cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim.[47]   A mere scintilla of evidence in support of the nonmoving party's position will not suffice; rather, the non-moving party must present evidence on which a jury could reasonably find for the nonmovant in order to survive summary judgment.[48]   Accordingly, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a

---

[42] Fed. R. Civ. P. 56(c).

[43] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[44] Id.

[45] Id. at 255.

[46] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

[47] Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).

[48] Liberty Lobby, 477 U.S. at 252.

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[49]

## IV.   DISCUSSION

Plaintiff argues that he is entitled to Summary Judgment on the following grounds: 1) the 1995 Severance Policy is the operative document to determine Plaintiff's severance benefits, and that Policy is a "top hat" plan governed by federal common law contract principles, under which Bancroft's 1995 Severance Policy constitutes an offer for a unilateral contract that was accepted when Plaintiff continued employment in consideration for the severance pay promised by Bancroft for 10 years of service; 2) in the alternative, if the Court does not enforce the 1995 Severance Policy, it should enforce the June 2005 Severance Policy, under which Plaintiff is owed one year's salary; and 3) Bancroft's in-house counsel has conceded that Plaintiff is entitled to deferred compensation in the amount of $9,499.

Bancroft argues that it is entitled to summary judgment on Counts I and II of the Second Amended Complaint on the following grounds: 1) the July 2005 Severance Policy is the operative document governing Plaintiff's eligibility for benefits, so Plaintiff cannot enforce the 1995 Policy, and even if he could, Plaintiff is not entitled to benefits under the 1995 Plan because it is an employee welfare benefit plan, not a top hat plan, under which Plaintiff's rights to benefits were not vested; and 2) the June 2005 Draft of the Severance Policy that Plaintiff seeks to enforce in the alternative to the 1995 Severance Policy was never adopted by Bancroft, and therefore, the July 2005 Severance Policy controls and Plaintiff is not entitled to any benefits because he was terminated for poor job performance.   We note that Bancroft's Partial Motion only moves for summary judgment on Counts I and II, however, it does oppose Plaintiff's motion for summary judgment on Count III in its response to Plaintiff's Motion.

---

[49] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

As a preliminary matter, all three of Plaintiff's causes of action in the Second Amended Complaint are asserted under ERISA. ERISA is a comprehensive federal statute enacted "in the interests of employees and their beneficiaries" to provide minimum standards to employee benefit plans, "assuring the equitable character of such plans and their financial soundness."[50] ERISA's framework ensures that employee benefit plans are governed by written documents and summary plan descriptions, as these are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits.[51] Even though Plaintiff does not specifically identify this provision of ERISA in the Second Amended Complaint, Plaintiff's claims fall squarely within § 1132(a)(1)(B), which provides, "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, [or] to enforce his rights under the terms of the plan . . . ." Therefore, ERISA governs this Court's analysis of Plaintiff's claims.

After establishing that ERISA applies to this action, we turn to our standard of review under ERISA. In drafting ERISA, Congress did not set out a standard of review applicable to actions brought by a plan participant alleging a denial of benefits, as is the case here.[52] To fill this gap, federal courts adopted the "arbitrary and capricious" standard developed under a provision of the Labor Management Relations Act ("LMRA").[53] In determining the appropriate ERISA standard of review, the Supreme Court held in Firestone Tire & Rubber Co. v. Bruch that universal application of the arbitrary and capricious

---

[50] 29 U.S.C. § 1001(a).

[51] See, e.g., Hamilton v. Air Jamaica, Ltd., 945 F.2d 74 (3d Cir. 1991); 29 U.S.C. § 1022(a)(1).

[52] E.g., Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989).

[53] See, e.g., Struble v. N.J. Brewery Employees' Welfare Trust Fund, 732 F.2d 325, 333 (3d Cir. 1984); 29 U.S.C. § 186(c).

standard is inappropriate.[54]  Instead, the <u>Firestone</u> Court applied principles of trust law, and laid out the

rule that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard

unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility

for benefits or to construe the terms of the plan," in which case the arbitrary and capricious standard

applies.[55]

Every version of Bancroft's severance plan that the parties seek to enforce in their cross-

motions for summary judgment contains a clause stating "[a]uthorization to grant severance pay in

accordance with this policy will be determined by the Chief Executive Officer, or his designee with the

agreement of Personnel and Management Committee."[56]  Likewise, Bancroft's Deferred Compensation

Plan explains, "[a]ny decision or action taken by the Committee [comprised of three Bancroft officers],

arising out of or in connection with the construction, administration or interpretation of the Plan and its

rules and regulations shall be conclusive and binding upon all Participants . . . ." [57]  The Third Circuit has

held similar language sufficient to grant the plan administrator authority to determine eligibility for

benefits.[58]  Therefore, we find that Bancroft's severance policy and Deferred Compensation Plan both

---

[54] <u>Firestone</u>, 489 U.S. at 109.

[55] <u>Id.</u>

[56] Pl.'s Mot. Exs. 4, 5.

[57] Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 5 at 10.  Paragraph 6.1 of the Deferred Compensation Plan grants the right to terminate, modify or amend that Plan, provided that no amendment shall have a material adverse effect upon rights earned or amounts being paid as of the date of such amendment or termination.  <u>Id.</u>

[58] <u>See, e.g.</u>, <u>Abnathya v. Hoffmann-La Roche, Inc.</u>, 2 F.3d 40, 45 (3d Cir. 1993) (affirming the district court's finding that a plan providing that the Committee shall have "the power to interpret and construe the Plan, to direct payment of benefits and to determine all questions of eligibility" and that "[t]he Committee's determination of all questions under the Plan shall be binding on all employees" granted the administrator discretionary authority to determine eligibility for benefits); <u>Stoetzner v. U.S. Steel Corp.</u>, 897 F.2d 115, 119 (3d Cir. 1990) (finding administrator discretion to determine eligibility for benefits based on plan language granting administrator authority to "administer, . . . decide all questions," interpret and apply rule of the plan).

expressly give the administrator discretionary authority to determine eligibility for benefits.  Accordingly, we will apply the arbitrary and capricious standard to our analysis of Bancroft's severance policies and Deferred Compensation Plan to our analysis of Bancroft's decision to deny Plaintiff's benefits.

**A.      Severance Policy Benefits**

Plaintiff's Motion for Summary Judgment proceeds in the same manner as its Second Amended Complaint, arguing that the 1995 Severance Policy should apply, and if it does not, then the June 2005 Draft applies.  We will first address whether Bancroft's severance policy is a top hat or an employee welfare benefit plan, then we will determine which version of Bancroft's severance policy applies, and last, we will decide whether Bancroft's decision to deny Plaintiff's severance benefits was arbitrary and capricious under the appropriate version of the severance policy.

1.      Top Hat vs. Employee Welfare Benefit Plan

In support of his argument that he is entitled to the benefits laid out in the 1995 Severance Policy, Plaintiff argues that this policy constitutes a "top hat" plan.  ERISA defines a top hat plan as "[a] plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."[59]  Bancroft argues in opposition that its severance policy is, and always has been, an employee welfare benefit plan.[60]  ERISA defines an employee welfare benefit plan as any plan, fund, or program established or maintained by an employer for the purpose of providing benefits for its participants or their beneficiaries.[61]  "Severance pay

---

[59] 29 U.S.C. § 1051(2).

[60] ERISA, its implementing regulations, and cases construing the same, have used the terms "employee welfare benefit plan," "welfare benefit plan," "employee welfare plan," and "welfare plan" interchangeably, and accordingly, we also use the aforementioned terms interchangeably herein.

[61] See 29 U.S.C. § 1002(1).

plans are classified under [ERISA] as welfare benefit plans."[62]  Construing ERISA by regulation, the Department of Labor has determined that severance pay plans will be treated as employee welfare benefit plans where: (1) such severance payments are not contingent upon the employee's retirement; (2) the total amount does not exceed twice the employee's annual compensation; and (3) all payments are completed within 24 months of termination.[63]

Plaintiff asserts that Bancroft's severance policy is a top hat plan because it is unfunded and primarily maintained to provide deferred compensation to a select group of management.  Defendant does not dispute, as it cannot, that this plan was targeted at a select group of Bancroft's management, so that is not a point of contention on this issue.  Plaintiff points to a 1995 interoffice memorandum from Ted Beringer, a member of Bancroft's Board of Trustees and P&M Committee at that time, to the entire company, summarizing his "suggestions" for executive benefits for a number of executives, including Plaintiff.[64]  In this memorandum, Beringer explains "[m]y feeling is that Bancroft could provide this [severance] benefit on an unfunded basis . . . ."[65]  The Court does not give this evidence any weight as Plaintiff has not presented any evidence to show that these suggestions were ever formally adopted in any of the severance policies presented to the Court.  More importantly, Defendant presented the affidavit of John Carney, Bancroft's former Vice President of Human Resources, to show that Bancroft did not accept all of the suggestions in Ted Beringer's memorandum.[66]  Even assuming, *arguendo*, that this plan was

---

[62] Koenig, 156 Fed. App'x 461, 466 (citing 29 U.S.C. §§ 186(c), 1002(1)(B)).

[63] 29 C.F.R. § 2510.3-1 ("The purpose of this section is to clarify the definition of the term[] 'employee welfare benefit plan' . . . by identifying certain practices which do not constitute employee welfare benefit plans . . . .").

[64] Pl.'s Mot. Ex. 7.

[65] Id.

[66] Carney Decl. 6.

unfunded, we are not persuaded by Plaintiff's next argument depicting Bancroft's severance policy as a top hat plan.

Plaintiff argues that the 1995 Severance Policy has the primary purpose of providing deferred compensation for a select group of management, as ERISA requires in order for a plan to be considered a top hat.  Defendant argues, and we agree, that nothing in the record supports Plaintiff's position that the primary purpose of the 1995 Severance Policy was to provide deferred compensation.  In response to this argument, Plaintiff invokes In re IT Group, Inc.,[67] to show that the 1995 Severance Policy fits within the Third Circuit's definition of a deferred compensation plan.  In IT Group, the Third Circuit explained,

> a deferred compensation plan is an agreement by the employer to pay compensation to employees at a future date.  The main purpose of the plan is to defer the payment of taxes. The idea is to defer the receipt of compensation until retirement or termination of employment, when the employee is in a lower tax bracket, thus reducing the overall amount of taxes paid.[68]

Specifically, Plaintiff argues that the 1995 Severance Policy is an agreement by Bancroft to pay compensation at a future date upon the termination of Plaintiff's employment.  While Plaintiff is correct that the 1995 Severance Policy is an agreement to pay some form of compensation at a future date, he completely ignores the requirement that it be *deferred* compensation.  The compensation contemplated in the 1995 Severance Policy, and all of Bancroft's severance policies relevant here, say nothing of employees contributing or deferring any portion of their salary to be paid out later upon their separation from Bancroft.

Additionally, two separate plans are at issue in this matter, Bancroft's severance policy and its Deferred Compensation Plan.   The Court reads Bancroft's severance policy and its Deferred

---

[67] 448 F.3d 661 (3d Cir. 2006).

[68] Id. at 664-65 (internal citation omitted).

Compensation Plan as two separate plans, with separate controlling documents.  In fact, the existence of a separate Deferred Compensation Plan, the main purpose of which is to provide deferred compensation to key executives of Bancroft, strongly implies that no version of the severance policy was intended to provide deferred compensation for Bancroft employees.  Therefore, we reject Plaintiff's argument that Bancroft's severance policy is a top hat plan.

Additionally, courts in this circuit have consistently found plans similar to Bancroft's severance policy to be employee welfare benefit plans.  In <u>Pane v. RCA Corporation</u>, the Third Circuit affirmed the district court's ruling that a severance plan set up to retain company executives during a merger was an employee welfare benefit plan governed by ERISA.[69]  In finding that the severance plan at issue constituted an employee welfare benefit plan, the <u>Pane</u> Court focused on the plan's requirement that the employee be terminated for reasons other than cause in order to be entitled to benefits.[70]  Alternatively, in <u>Angst v. Mack Trucks, Inc.</u>, the Third Circuit held that the severance plan at issue was not an employee benefit plan, distinguishing it from <u>Pane</u> because it involved a plan that required the administrator to analyze each employee's situation in light of particular criteria, and the severance plan in <u>Angst</u> required no such discretionary analysis.[71]

While not controlling our decision, we not that in <u>Lempa v. Rohm & Haas Company</u>, the Eastern District of Pennsylvania held that an almost identical severance policy constituted an employee welfare benefit plan.[72]  The severance policy at issue in <u>Lempa</u> based eligibility on the employee having

---

[69] 868 F.2d 631 (3d Cir. 1989).

[70] <u>Id.</u> at 635.

[71] 969 F.2d 1530, 1539 (3d Cir. 1992).

[72] No. 05-0985, 2007 WL 878496, at *3 (E.D. Pa. March 20, 2007).

-15-

been terminated for job elimination, RIF, or restructuring, and a participant in the <u>Lempa</u> severance plan would be ineligible for severance benefits if he or she was terminated for failure to satisfactorily perform the essential duties of his or her employment, violation of the law, or other behavior that Defendant determined to constitute a material breach.[73]  The employee is also required to execute a binding release form under the <u>Lempa</u> plan, and the employee can choose from four different payment schemes, including a lump sum or a series of monthly payments.[74]  The severance policy at issue here sets the same parameters for eligibility, that an employee be terminated as part of a RIF or layoff, that they sign a separation agreement, and employees also have the option of receiving benefits in a lump sum or on a regular paycheck schedule.  Just as the Eastern District of Pennsylvania found in <u>Lempa</u>, we similarly find that Bancroft's severance policy is an employee welfare benefit plan governed by ERISA.

       2.      Which Severance Policy Applies

      As explained in the factual background above, three different versions of Bancroft's severance policy were enacted during Plaintiff's employment: the 1995 Severance Policy; the June 2005 Severance Policy, and the July 2005 Severance Policy.  In Count I of the Second Amended Complaint, Plaintiff asserts that the 1995 Severance Policy governs the eligibility for, and calculation of, his severance benefits.  Defendant argues that the July 2005 Severance Policy is the operative document that the Court should apply here because it properly amended the 1995 Severance Policy.  In Count II of the Second Amended Complaint, Plaintiff asserts, in the alternative, that if the Court finds that Bancroft properly amended the 1995 Severance Policy, then we should apply the June 2005 draft of the severance plan that was inadvertently disseminated to him, not the July 2005 Severance Policy that Bancroft alleges was in

---

[73] <u>Id.</u>

[74] <u>Id.</u>

force at the time of his termination, because he was not properly notified of the changes implemented by the July 2005 Severance Policy.

It is well settled that "companies are free to amend their pension plans if the amendments are formal written amendments that are executed in accordance with the Plan's procedure for amendments and that are incorporated into the Plan document."[75]  Plaintiff does not dispute that Bancroft properly amended the 1995 Severance Policy; rather, Plaintiff asserts that his rights and benefits to two years' salary irrevocably vested under the 1995 Severance Policy upon the anniversary of his tenth year of employment at Bancroft, in September of 2001.  Bancroft's 1995 Severance Plan provides a schedule of benefits to be paid to participants, increasing in conjunction with the number of years they have been employed at Bancroft.  The 1995 Severance plan allots a "Maximum Severance Payment" of 24 months' pay to qualifying employees with more than 10 years of service to Bancroft.[76]

The Third Circuit has held that "ERISA exempts severance and other welfare benefit plans from its vesting requirements . . . so that benefits offered under such plans are typically 'unaccrued and nonvested.'"[77]  As a result, "employers or other plan sponsors are generally free under ERISA, for any reason and at any time, to adopt, modify or terminate welfare plans."[78]  However, ERISA does allow for employers to offer vested severance benefits under a very limited set of circumstances.  Where the express terms of a plan unequivocally "provide[] that an employee is irrevocably entitled to a certain benefit, and

---

[75] <u>Abramowicz v. Rohm & Haas Co.</u>, No. 00-4645, 2001 U.S. Dist. LEXIS 17693, at *15 (E.D. Pa. Oct. 30, 2001) (citing <u>Epright v. Envtl. Res. Mgmt.</u>, 81 F.3d 335, 342 (3d Cir. 1996)).

[76] Pl.'s Mot. Ex. 4 at 2.

[77] <u>Hooven v. Exxon Mobil Corp.</u>, 465 F.3d 566, 574 (3d Cir. 2006) (citing 29 U.S.C. § 1051(1)) (internal citation omitted)).

[78] <u>Id.</u> (quoting <u>Curtiss-Wright Corp. v. Schoonejongen</u>, 514 U.S. 73, 78 (1995)).

where all of the conditions precedent to the employee's receipt of that benefit have been satisfied, that benefit is said to have accrued (or 'vested' or 'ripened') and cannot be taken away by plan amendment or termination."[79]   The Third Circuit explained, "[a]t that point, but not before, the employee's rights to benefits become enforceable through a typical ERISA section 502(a)(1)(B) action."[80]

> ### a.     Whether the 1995 Severance Policy Applies

Plaintiff has not identified any record evidence to show that the 1995 Severance Policy, or any version of Bancroft severance policy, expressly state that the benefits contemplated in the terms of the policy irrevocably entitle employees to the "maximum severance payment,"[81] which Plaintiff is seeking, either at the point when they reached the requisite years of service laid out in the policy, or at any other point.  Plaintiff relies on the theory that the 1995 Severance Policy was a unilateral contract, which created a vested right in the employees who accepted Bancroft's offer by continuing their employment for the requisite number of years.  This entire argument is based on the premise that Bancroft's severance policy was a top hat plan, which requires the application of federal common law of contracts, and it is therefore inapplicable here since we have found that every version of Bancroft's severance policy represents an employee welfare benefit plan, not a top hat.  Additionally, the 1995 Severance Plan did not create irrevocable rights to severance because it expressly reserved "[a]uthorization to grant severance pay" to be "determined by the Chief Executive Officer, or his designee with the agreement of the Personnel and Management Committee."[82]

---

[79] Id. (internal citation and quotation omitted).

[80] Id.

[81] Pl.'s Mot., Ex. 4.

[82] Pl.'s Mot. Ex. 4 at 2.

Having established that Bancroft's severance policy did not expressly create irrevocable rights, we find that Plaintiff has no vested rights under the 1995 Severance Policy. Therefore, we will grant summary judgment to Bancroft on Count I because it amended its severance policy twice, as Plaintiff does not dispute, and since Plaintiff's rights were not vested at any point, he has no enforceable rights remaining under the 1995 Severance Policy.

b.   Whether the June 2005 Severance Policy Applies

In support of summary judgment on Count II, Plaintiff alleges that he was inadvertently given a copy of the June 2005 Severance Policy, which he signed upon receipt, in place of the appropriate July 2005 Severance Policy that Bancroft intended to disseminate to employees in July 2005. The record evidence before us establishes that Plaintiff did in fact receive and sign the June 2005 Severance Policy in July of 2005, and never did so for the July 2005 Severance Policy. Bancroft asserts that Plaintiff had sufficient notice of the July 2005 Severance Policy as he testified at his deposition that he was aware of the modifications to the 1995 Severance Policy, and even discussed them with other employees, and because he had been provided with minutes of the relevant Board meetings in 2004 and 2005 during which the amendments to the severance policy were implemented, ultimately resulting in the adoption of the July 2005 Severance Policy.

The Court is unaware of any ERISA notice provisions requiring plan administrators to obtain the signatures of plan participants or beneficiaries in order for an amendment to take effect.[83]  In any event, we find that whichever version of Bancroft's severance policy applies, be it the June 2005 or July 2005 Severance Policy, is immaterial to Plaintiff's eligibility to receive severance benefits as the few differences between the two versions have no bearing on Plaintiff's eligibility to receive severance benefits.

---

[83] See generally 29 U.S.C. § 1024(b)(1).

Having found that Bancroft's 1995 Severance Policy constituted an employee welfare benefit plan under which Plaintiff had no vested rights, and that it was properly amended by at least the June 2005 Severance Policy, if not also by the July 2005 Severance Policy as well, we will analyze both the June and July 2005 Severance Policies to determine Plaintiff's eligibility to receive severance benefits from Bancroft.

        3.      Bancroft's Decision to Deny Benefits

Next, we apply the June and July 2005 Severance Policies to examine if a genuine issue of material fact exists as to whether Bancroft's decision to deny Plaintiff of severance benefits was arbitrary and capricious. Under the arbitrary and capricious standard applied to ERISA cases where a plan administrator has discretion to determine employees' eligibility, "the district court may overturn a decision of the Plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."[84] "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits."[85] The Supreme Court held in Firestone, however, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."[86]

The Third Circuit has adopted a sliding scale approach to cases involving an apparent conflict of interest, calibrating the intensity of its arbitrary and capricious review to the intensity of the conflict.[87] Where an employer is directly funding a portion of an employee benefit plan, and would thereby

---

[84] Abnathya, 2 F.3d at 45 (internal citation omitted).

[85] Id.

[86] 489 U.S. at 115.

[87] Tobias v. PPL Elec. Utils. Corp., 193 Fed. App'x 158, 164 (3d Cir. 2006) (citing Pinto v. Reliance Standard Life Ins., 214 F.3d 377, 392-93 (3d Cir. 2000)).

stand to benefit financially from the denial of an employee's claim, a "somewhat heightened" standard of review applies, warranting a "more penetrating review of an administrator's decisionmaking process."[88] Additionally, "demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits" warrants a heightened standard of review.[89]   In our application of the Third Circuit's sliding scale approach, we will consider Plaintiff's allegations in determining the appropriate intensity to apply to our arbitrary and capricious review standard of Bancroft's decision-making process in denying him benefits.

Bancroft's June and July 2005 Severance Policies both state that only "Key Executives who are terminated because of a release will receive severance pay upon the execution of a Confidential Severance Agreement . . . ."[90]   Both of these versions of the severance policy define "Release" as "[s]eparation from employment as a result of reduction in force or lay-off."[91]   Plaintiff argues that he was laid off as a part of a RIF or layoff, and is therefore eligible to receive severance benefits under either policy.  In support of his argument, Plaintiff cites two e-mails from Bancroft's President.  The first e-mail was sent to all Bancroft Associates on the date of Plaintiff's termination, stating in pertinent part: "Dr. Terry Page has left Bancroft, effective today.  This change was necessary as I continue my efforts to streamline the management team and to reduce expenses. . . . Since most of our costs are associated with salaries, personnel changes are the only way to materially reduce expenses."[92]   The second e-mail Plaintiff

---

[88] Id. (quoting Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan, 298 F.3d 191, 199 (3d Cir. 2002)).

[89] Id. (quoting Kosiba, 384 F.3d at 66).

[90] Pl.'s Resp. Ex. 11 at 1; Id. Ex. 12 at 1.

[91] Id.

[92] Pl.'s Resp. at 9 Ex. 15 at 1.

presents to establish that his termination was an RIF or layoff is an e-mail from Bancroft's President, sent

directly to Plaintiff in May 2005, explaining:

> You are a wonderful colleague and, from my perspective, a good friend.  You are also an
> extraordinary asset to this institution.  I hope you know and understand the value you bring
> to these kids.  They love you.  I have made it my business to find this out, so I am not
> guessing about this.  In the short term, you may not completely adore my decisions, but in
> the longer term, say one year, I think you will be pleased.  Just give me a little bit of leeway
> for now.  And for God's sake, and for mine, please hang in there.  We both need you.[93]

Plaintiff has also alleged that he and other Bancroft employees viewed the amendments to

the severance plan that significantly narrowed eligibility for benefits as unilateral and unfair.  In light of

the evidence presented by Plaintiff, including receiving and signing an acknowledgment of the wrong

version of the severance policy, and because Bancroft's severance policy creates a conflict of interest where

it is funded by its own revenue, we will apply a heightened standard of review here.  In accordance with

Third Circuit precedent applying this heightened standard of review, we will take into account the

sophistication of the parties, the information accessible to the parties, the particular financial arrangement

involved, and Bancroft's financial interest in its decision to deny Plaintiff's benefits.[94]

We now turn to Bancroft's decision-making process to determine whether its denial of

Plaintiff's severance benefits was unsupported by reason, without substantial evidence or erroneous as a

matter of law.  If none of these circumstances are apparent, then we must uphold Bancroft's decision

pursuant to ERISA.  Defendant argues that Plaintiff was terminated for one of the reasons expressly listed

as grounds for ineligibility to receive severance in both the June and July 2005 Severance Policies, namely

"Bancroft Neurohealth's good faith judgment that Executive has failed to perform the duties of his/her

---

[93] Id.

[94] See, e.g., id.; Pinto, 214 F.3d at 392.

position in a competent manner . . . ."[95]  In support of this argument, Bancroft presents the "Separation of Employment Notice" filed in its internal records upon Plaintiff's termination, which contains under "Reason for Separation," a checked box for "Unsatisfactory Job Performance."[96]  This separation notice also contains "Comments to Clarify" that explain that this decision was made "per 360° Evaluation + executive feedback," and it explains that Plaintiff is not eligible for rehire.[97]

Bancroft also presents the deposition testimony of its general counsel, Melissa Wheatcroft, who also prepared Plaintiff's evaluation leading up to his termination, to provide context for the separation notice and to explain the problems that necessitated Plaintiff's termination generally.  At her deposition, Wheatcroft explained that the President of Bancroft was "concerned about [Plaintiff's] ability to manage change effectively," and that Plaintiff was "concerned about being well liked and not able to make the tough decisions that needed to be made with respect to his subordinates."[98]  Wheatcroft further explained that state agencies interfered with their operations in response to complaints from families, partially because parents didn't trust Plaintiff; "They didn't think that he listened to their concerns."[99]

Wheatcroft also explained that she and the President of Bancroft both felt that Plaintiff had an antagonistic relationship with the state and didn't work well with them due to "frequently tense" conversations with state representatives.[100]  The President thought Plaintiff was not able to handle the parents' concerns anymore; "he wanted a kinder, gentler soul to be the head of [the program that Plaintiff

---

[95] Id. Ex. 12 at 1.

[96] Id. Ex. 13 at 1.

[97] Id.

[98] Wheatcroft Dep. 39:14-40:7.

[99] Id. 40:7-41:6.

[100] Id. 44:10-19.

oversaw]."[101]   Additionally, Wheatcroft continued to explain at her deposition that even though Plaintiff was regarded as being personable, Plaintiff "did not always play nicely with others, and [Bancroft's President] had really started to sense some division among the team members."[102]   The President of Bancroft, as well as two other Bancroft executives, all felt that Plaintiff was not on board with the necessary culture and management changes that needed to occur to improve Bancroft.[103]   Lastly, Wheatcroft testified that the President of Bancroft "was terminating [Plaintiff] for performance reasons, so he was not entitled to severance under any of the existing policies."[104]

The Court has examined the two pieces of evidence proffered by Bancroft to show that Plaintiff was terminated for poor job performance.  The Separation Employment Notice that Bancroft relies on to show that Plaintiff was performing poorly, and which allegedly resulted in his termination, is post-dated from Plaintiff's termination.  It is well established in the record of this case that Plaintiff was terminated on September 7, 2005.  The Separation Employment Notice is dated September 29, 2005, and signed by Bancroft's general counsel on the same date.[105]   This is the only written documentation offered by Bancroft to establish Plaintiff's alleged poor performance.  The Court views this after-the-fact, self-serving evaluation of Plaintiff's performance with a very critical eye.  The import of this evidence would be substantially greater if it was accompanied by a number of periodic reviews displaying the same information as the post-termination Separation Employment Notice here, or even if it pre-dated Plaintiff's

---

[101] Id. 40:22-41:13.

[102] Id. 45:5-15.

[103] Id. 45:16-46:3.

[104] Id. 59:7-10.

[105] Pl.'s Mot. Ex. 11 at 1.

termination.  But it is not.  On its own, dated three weeks after Plaintiff was terminated, this Separation Employment Notice leaves too many material questions of fact unanswered on the issue of Bancroft's reasons for Plaintiff's termination for the Court to grant Summary Judgment in Bancroft's favor.

   Next, we look at the deposition testimony of Melissa Wheatcroft, Bancroft's general counsel.  Wheatcroft explained the sentiment of Bancroft's President, herself, and some other executives, that Plaintiff was performing poorly in some areas, particularly, interacting with other people.  This testimony comes from a deposition taken almost two years after Plaintiff's termination, and well after this litigation commenced.  While Wheatcroft identifies specific problems that Bancroft representatives expressed to her concerning Plaintiff's performance, none of this testimony is supported by written documents prepared before Plaintiff's termination.  The only supporting written document discussed in the excerpts of the Wheatcroft deposition presented to the Court is the aforementioned Separation Employment Notice, prepared after Plaintiff's termination.  Wheatcroft's testimony references the Separation Notice, particularly, a "360° Evaluation" that she prepared leading up to Plaintiff's termination, but Bancroft fails to offer any written documentation memorializing this evaluation, or any of its components.  Applying the heightened arbitrary and capricious standard of review, taking into account Bancroft's conflict of interest in denying Plaintiff's benefits in the face of its self-proclaimed financial difficulties, the absence of any written documentation on the record going to show Plaintiff's poor performance renders Wheatcroft's testimony is far from substantial.

   Throughout Wheatcroft's deposition, she testified to opinions of Bancroft's president and other executives.  The vast majority of Wheatcroft's deposition relies on hearsay from the President of Bancroft, regarding Plaintiff's performance problems and his reasons for terminating Page.  The only written documents on the record from the President of Bancroft that speak to Plaintiff's performance are

the e-mails presented by Plaintiff.  Page proffers an e-mail from the President of Bancroft, sent in May 2005, praising him for being an "extraordinary asset " to Bancroft and how much he is loved by the children he works with.[106]  The other e-mail proffered by Plaintiff, which is the e-mail the President of Bancroft sent to the entire company announcing Plaintiff's termination on Page's last day at Bancroft, contains language implying that Plaintiff was released due to an RIF.  This e-mail announcing Page's departure explains,  "[t]his change was necessary as I continue my efforts to streamline the management team and reduce expenses. . . . Since most of our costs are associated with salaries, personnel changes are the only way to materially reduce expenses."[107]  While not enough to quiet all factual questions regarding his eligibility, this evidence presented by Plaintiff is enough to create material issues of fact as to Bancroft's reasons for terminating him, in light of the evidence proffered by Bancroft.

Applying the somewhat heightened standard of review to these facts, we find that Bancroft's decision to deny benefits is not properly supported by substantial evidence.  The record evidence presented by Bancroft in support of its decision fails to satisfy the factual questions raised by Plaintiff.  Likewise, Plaintiff's evidence is insufficient as a matter of law or fact to establish that Bancroft's decision was arbitrary and capricious and that he is, in fact, entitled to benefits under the June 2005 Severance Policy, as he argues.  Therefore, we find that a genuine issue of material fact exists regarding Bancroft's decision to deny Plaintiff of severance benefits due to his termination under either the June 2005 or July 2005 Severance Policies.  Accordingly, we will deny Defendant Bancroft's Motion for Summary Judgment on Counts I and II, and also deny Plaintiff's Motion for Summary Judgment on Count II.

---

[106] Pl.'s Resp. Ex. 15 at 1.

[107]  Pl.'s Resp. Ex. 14 at 1.

**B.     Deferred Compensation Benefits**

Plaintiff asserts that he is entitled to summary judgment on Count III because Melissa Wheatcroft, Bancroft's General Counsel, has conceded that Defendant owes deferred compensation to Plaintiff.  Defendant argues in opposition that the sole piece of evidence Plaintiff relies on in support of this argument, the deposition testimony of Bancroft's General Counsel, is inadmissible under Federal Rule of Evidence 408(a)(1), as it is tied to negotiation settlements between the parties.

Plaintiff's entire argument does, in fact, rely solely on the deposition testimony of Melissa Wheatcroft, Bancroft's General Counsel at the time of Plaintiff's termination.  Plaintiff relies on the following testimony to show that he is entitled to deferred compensation as follows:

> Q:     Is Dr. Page entitled to any deferred compensation?
> A:     Yes.
> Q:     How much?
> A:     I don't know the exact number, but I believe it's approximately nine thousand something.
> Q:     And why hasn't that been paid out?
> A:     Because I believe that we offered to pay it out if you agreed that was the amount of money that he was entitled to, and we still have not received an agreement that that's the right number so we haven't paid anything yet.
> Q:     Any other reason other than that that it hasn't been paid out?
> A:     No.
> Q:     I have a letter from your counsel which indicates deferred compensation in the amount of nine thousand four hundred ninety-nine dollars.  Does that sound accurate?
> A:     I was going to guess ninety-five hundred, so yes, that sounds very accurate.[108]

This testimony was part of an entire deposition, which has been cited by both parties on numerous points.  On the issue of deferred compensation, however, Plaintiff provided the Court with a two-page selection of the testimony quoted above.  Defendant's explanation that this testimony excerpt is not dispositive of Plaintiff's eligibility to receive any deferred compensation at all, let alone the amount

---

[108] Wheatcroft Dep. 159:2–160:2, Aug. 29, 2007.

of $9,499.00, because the "letter from [Bancroft's] counsel" referenced in the Wheatcroft deposition is a settlement offer for approximately $9,499.00.[109]  Defendant argues that this evidence is inadmissible pursuant to Federal Rule of Evidence 408(a)(1) because it was settlement offer for the deferred compensation claim, sent on June 6, 2007 in anticipation of the settlement conference scheduled for June 12, 2007.  The settlement offer letter, attached as an exhibit to Plaintiff's Motion for Summary Judgment, clearly explains that "[t]his letter is offered solely for settlement purposes and is not to be considered an admission by Bancroft or deemed admissible evidence in any court proceeding."[110]

It is well established that in deciding a summary judgment motion, the Court can only consider evidence that "could be later presented in a form that would be admissible at trial–i.e. reducible to admissible form."[111]  Bancroft argues that the deposition testimony of its General Counsel regarding whether Plaintiff is owed deferred compensation is contingent on the inadmissible settlement offer letter that Defendant has presented, and therefore, the testimony is inadmissible itself.  The attorney examining Wheatcroft at her deposition references this letter when inquiring about Wheatcroft's understanding of the amount of deferred compensation owed to Plaintiff.  Additionally, this letter is the sole evidence presented that reflects in writing the amount of deferred compensation sought by Plaintiff, and without any more context provided by the record evidence presented, it suggests that the settlement letter explains Wheatcroft's testimony that the reason the owed amount of deferred compensation had not been paid was based on Plaintiff's failure to agree that $9,499.00 was the accurate amount.  Therefore, the Court cannot be sure whether Defendant owed Plaintiff deferred compensation, or if the amount Plaintiff argues that he

---

[109] Def.'s Resp. at 13 (quoting Wheatcroft Dep. 159:20).

[110] Def.'s Resp. Ex. D at 1.

[111] Gower v. Savage Arms, Inc., 166 F. Supp. 240, 251 (E.D. Pa. 2001).

is owed emanates from settlement negotiations.

In the event that the deferred compensation amount allegedly owed to Plaintiff did come from a settlement offer, Federal Rule of Evidence 408(a)(1) prohibits the admission of an offer to furnish a valuable consideration in attempting to compromise a claim when such evidence is offered to prove liability for, or amount of, a claim that was disputed as to validity or amount.  Plaintiff offers Wheatcroft's deposition testimony as his sole piece of evidence to show that Bancroft is liable to pay him deferred compensation in the amount Wheatcroft testified to.  Because this testimony likely depends on the validity and admissibility of the settlement offer letter, which is clearly inadmissible under Federal Rule of Evidence 408, it is unlikely that this testimony can be reduced to an admissible form at trial.

Defendant further argues that Plaintiff is not entitled to summary judgment because he has failed to present any evidence of how much compensation, if any, Bancroft deferred on his behalf during the relevant period and because the monies he deferred during the relevant period were subject to a deferral cycle, under which his rights to the money contributed were not vested at the time of his termination.  Plaintiff has not presented any evidence of the amount(s), dates, or even the existence of any contributions he made to be paid out later as deferred compensation.  This lack of evidence by itself is not a fatal flaw to Plaintiff's summary judgment motion on Count III though, so the Court will weigh it along with the other evidence presented.

On the issue of Bancroft's "Deferral Cycle," the Deferred Compensation Plan presented by the parties does in fact explain that employees must complete a cycle of five years of continuous employment before they are entitled to receive payment of contributions to their deferred compensation account.[112]    Additionally, as Defendant points out, the Deferred Compensation Plan contains a

---

[112] Pl.'s Mot. Ex. 5.

-29-

"Forfeitures" provision, explaining that a participant in Bancroft's Deferred Compensation Plan who separates from Bancroft before completing a deferral cycle  "shall forfeit the balance in his Deferred Compensation Account attributable to each incomplete Deferral Cycle."[113]  As the Deferred Compensation Plan defines "separation" as a severance of the employer-employee relationship other than total and permanent disability or death, we find that Plaintiff's termination falls within those parameters.[114]  Bancroft argues that Plaintiff was paid the fair value of the deferred compensation that he contributed during his first deferral cycle, 1995-2000, and on the basis of the forfeiture provision of the Deferred Compensation Plan, Bancroft asserts that Plaintiff was terminated before completing the next five-year deferral cycle, 2000-2005, and therefore, his contributions for that cycle are forfeited under the Plan.

It is apparent that numerous questions of fact exist with respect to Plaintiff's eligibility to receive deferred compensation and whether Bancroft's conduct was arbitrary and capricious.  Plaintiff's reliance on the deposition testimony of Bancroft's General Counsel fails to sufficiently demonstrate the absence of any genuine issue of material fact surrounding his entitlement to deferred compensation.  Bancroft has presented evidence upon which a jury could reasonably find in their favor.  Therefore, we must deny Plaintiff's Motion for Summary Judgment on Count III.  This issue will be preserved for bench trial.

## V.  CONCLUSION

For the foregoing reasons, we will grant Defendant's Motion for Summary Judgment on Count I.  We will deny Defendant's Partial Motion for Summary Judgment on Count II, and deny Plaintiff's Motion for Summary Judgment on all counts, as a genuine issue of material fact exists as to

---

[113] Id.

[114] Id.

-30-

whether Plaintiff is entitled to severance benefits under the June 2005 or July 2005 Severance Policies, and whether Plaintiff is owed deferred compensation from Bancroft.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**TERRY PAGE,**                 )
                                    )
                *Plaintiff,*          )
                                    )        **CIVIL ACTION**
                **v.**               )        **NO.  06-cv-4695**
                                    )
**BANCROFT NEUROHEALTH, INC.,**     )
                                    )
                *Defendant.*       )

_____

## ORDER

      **AND NOW**, this 29th day of August, 2008, upon consideration of Plaintiff's Motion for

Summary Judgment [Doc. No. 20], Defendant's Cross-Motion for Partial Summary Judgment [Doc.

No. 21], Plaintiff's Response in Opposition [Doc. No. 23], Defendant's Response in Opposition [Doc.

No. 22], Plaintiff's Reply [Doc. No. 26], and Defendant's Reply [Doc. No. 27], it is hereby

**ORDERED** that:

      1.      Defendant's Motion for Partial Summary Judgment is **GRANTED** as to Count I of the

            Second Amended Complaint;

      2.      Defendant's Motion for Partial Summary Judgment is **DENIED** as to Count II of the

            Second Amended Complaint; and

      3.      Plaintiff's Motion for Summary Judgment on all counts is **DENIED**.

            It is so **ORDERED**.

                                               **BY THE COURT:**

                                             **/s/ Cynthia M. Rufe**

                                             _____

                                             **CYNTHIA M. RUFE**